# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
July 7, 2015 Session

## STATE OF TENNESSEE v. TEVIN DOMINIQUE LUMPKIN

### Appeal from the Circuit Court for Henry County
### No. 15115     Donald E. Parish, Judge

_____

### No. W2014-01064-CCA-R3-CD  -  Filed February 9, 2016

_____

Following a jury trial, Defendant, Tevin Dominique Lumpkin, was convicted of first degree premeditated murder. He received a sentence of life imprisonment. On appeal, Defendant argues that the evidence was insufficient to support his conviction. After a thorough review, we affirm the judgment of the trial court.

## Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed

THOMAS T. WOODALL, P.J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and D. KELLY THOMAS, JR., JJ., joined.

Terry J. Leonard, Camden, Tennessee, for the Appellant, Tevin Dominique Lumpkin.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; and Matthew F. Stowe, District Attorney General; Beth Hall and Paul Hessing, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

*State's Proof*

On August 25, 2012, at approximately 2:41 a.m., Sergeant Bryan Hall of the Henry County Sheriff's Department responded to a shooting at a nightclub called Fahrenheit 101. Deputy Blake Jenkins also responded to the call along with several Paris "city units." Deputy Hall testified that when he arrived at the club there were "several hundred people running around." He said there were also people screaming and some people were in cars trying to leave the area. He described the scene as "pretty chaotic."

Deputy Hall and other officers blocked the remainder of the vehicles from leaving the area.

Sergeant Hall first spoke with one of the security guards at the nightclub who indicated that the shooter had left the building. Sergeant Hall then walked inside and saw the victim, Eric Kinley, lying on the floor with several individuals performing CPR on him. Other officers on the scene began interviewing witnesses and gathering the names and information from those individuals still there. After EMS personnel arrived, Sergeant Hall began securing any evidence inside the club. He covered several shell casings and "bullet heads" with cups and showed the evidence to investigators when they arrived. Sergeant Hall testified that he later made phone calls to the Madison County and Gibson County Sheriff's Departments and the Milan and Humboldt Police Departments "trying to get some general information on two suspects, [Defendant] and Charles Liphford."

Special Agent Joe Walker, Sr., a criminal investigator with the Tennessee Bureau of Investigation (TBI), arrived on the scene at approximately 4:05 a.m. on August 25, 2012. He learned that there had been a special performance at the nightclub that night and "a lot of people came from out of town to perform there." There were many people still "milling around" the parking lot when he arrived. The victim had already been pronounced dead, and Special Agent Walker spoke with Sergeant Hall. Special Agent Walker also testified: "I met with Investigator Jenkins, Sheriff Belew, Captain Lowe, and talked with them about what they had learned up to that point. Then they explained what they had discovered so far and they were looking at the video at that point." Special Agent Walker collected evidence and drew a diagram of the scene. He noted that the shooting occurred near the bar area, and the victim's body was lying in the middle of the floor. Special Agent Walker testified that four shell casings and three bullets were found on the scene. A fourth bullet was taken from the jukebox two days later. The bullets were all of the same caliber but were two different brands. Special Agent Walker noted that the victim's cell phone was in victim's left front pants pocket. He testified that the phone was damaged and that there were holes in the pocket.

Special Agent Walker testified that the nightclub had four video cameras, two inside and two outside. He and other officers watched the videos which showed where the shooting occurred. While still on the scene, Special Agent Walker identified Defendant and Charles Liphford as being involved in the shooting. He then obtained Defendant's and Mr. Liphford's driver's license photos as part of his investigation. Special Agent Walker also began looking for Jiles Yarbrough and Cody Harmon. A search warrant was executed at Defendant's and his girlfriend's apartment but nothing related to the shooting was found. At that point, Defendant had not been located. Special Agent Walker testified that two photographic lineups were prepared containing

2

Defendant's picture. In one of the lineups Defendant was wearing glasses, and he was not wearing them in the other photograph. The lineups were shown to individuals who were present at the time of the shooting.

At some point, Special Agent Walker began searching for Defendant outside of the State of Tennessee. The United States Marshal's Service eventually located Defendant and Mr. Liphford in Norfolk, Virginia, and they were taken into custody. Defendant was taken into custody pursuant to a warrant for first degree murder, and Mr. Liphford for a weapons violation. He said that Mr. Liphford was not charged with first degree murder because the video from the nightclub showed that Mr. Liphford was on the dance floor with his back to the shooting. Defendant was wearing glasses at the time he was taken into custody. He was also shown on video wearing the same glasses at the time of the shooting. Special Agent Walker and Investigator Jenkins transported Defendant and Mr. Liphford back to Tennessee.

Special Agent Walker testified that Jiles Yarbrough and Cody Harmon were later charged with first degree murder. He and Investigator Jenkins attempted to speak with Mr. Harmon, who was represented by counsel, but Mr. Harmon refused to cooperate. Mr. Yarbrough gave a sworn statement and agreed to testify. On cross-examination, Special Agent Walker testified that Mr. Liphford re-entered the club at some point on the night of the homicide with a gun and walked over and looked at the victim's body. He also testified that he never saw Defendant on the video without his glasses.

On cross-examination, Special Agent Walker agreed that it could be assumed that a bullet caused the damage to the victim's cell phone. He also agreed that it would be common sense for that gunshot to have caused the victim's body to "twirl around." Special Agent Walker also agreed that the victim was shot twice in the back and that both of the shots were fired "up to down."

Tomika Ray testified that she was at Fahrenheit 101 on the night of August 24, 2012, into the morning of August 25, 2012, with Keenan Kendall and someone named "Mitch." Ms. Ray testified that she also knew Jiles Yarbrough who went by the nickname "Black Bennie." She did not know the victim, Defendant, Cody Harmon, or Charles Liphford. Ms. Ray testified that she was in the club by the bar area when the victim pulled her hair. When she turned around the victim said, "I was trying to see if this was your real hair." Ms. Ray answered, "Yeah." She did not have any further conversation with the victim. She later walked down the steps and spoke to Jiles Yarbrough and told him that the victim pulled her hair and that she would indicate who the victim was by looking "up at him." Mr. Yarbrough then stated that he was going to "[w]hoop" the victim. Ms. Ray testified that she walked off and sat down. At some point, Ms. Ray heard gunshots, and she saw the victim lying on the floor. She then went

3

outside and eventually left the club before talking to police. She was later interviewed and gave a handwritten statement to police.

Tommy Taylor was working as a bouncer at Fahrenheit 101 on August 24-25, 2012. Mr. Taylor is six feet tall, and he weighed two-hundred and sixty pounds at the time. He did not know the victim, and he had seen Mr. Yarbrough at the club but did not know his name. Mr. Taylor did not know any of the other defendants. Prior to the shooting, Mr. Taylor was standing "in front of the bar, at the top of the stairs, nearest the bathroom." Mr. Taylor was watching the dance floor when he heard a loud argument. He saw the victim with three other men standing in front of him at the top of the stairs. Mr. Taylor approached the men and asked what was going on. They indicated that they were just talking, and Mr. Taylor told them to either stop arguing or leave the club. He then walked back over and resumed watching the dance floor. Mr. Taylor testified that the argument escalated again, and he "re-approached the crowd." He said that the men were "arguing, getting closer to each other, in each others faces." Mr. Taylor testified that a fight began, and he "broke through the middle of them and tried to separate them." He did not know who hit whom. Mr. Taylor heard one shot followed by a slight pause and then "[a]round four" consecutive shots. He thought that the shots came from behind him, and he turned around and "caught a flash of [the shooter] with the weapon in his hand firing at [the victim] all the way down the stairs." He later described the shooter to police as a "young, black gentleman with dreadlocks and a dark t-shirt." Mr. Taylor testified that when the shooting began the victim went down the stairs, down the side of the bar, and onto the dance floor. Mr. Taylor then ran down the stairs to assist the victim. The shooter ran towards the other set of stairs and out the door.

Mr. Taylor remained at the club and spoke with police. He viewed a photographic lineup and identified Defendant as the shooter. He also identified three people from the video at the nightclub as being involved in the fight prior to the shooting.

Cody Harmon testified that he has a prior felony conviction for robbery and a misdemeanor theft conviction. He acknowledged that pursuant to an agreement with the State in exchange for his testimony, he would be allowed to plead guilty to aggravated assault for the incident at Fahrenheit 101 with an agreed sentence of three years, "split to time served as to [his] plea date." Mr. Harmon testified that he had previously refused to give a statement as to the events that occurred on August 25, 2012; however, he waived his rights and gave a statement to police on January 22, 2013. He was represented by counsel at the time.

Mr. Harmon testified that he knew Defendant, Jiles Yarbrough, and Charles Liphford prior to August 25, 2012. He went with Laura Scott and Atoya Raspberry to Fahrenheit 101 on August 25, 2012, to watch Mr. Yarbrough perform at the club. Mr.

Harmon testified that while at the club, he drank gin, vodka, and beer. He said that Tomika Ray, Mr. Yarbrough's girlfriend at the time, was also at the club. At some point, Ms. Ray spoke to Mr. Yarbrough who then gathered Mr. Harmon and Defendant to him, and he said that he was going to "whoop somebody." Mr. Harmon did not know who Mr. Yarbrough was referring to at the time because Mr. Yarbrough just pointed. However, the victim was the only person standing in the direction that Mr. Yarbrough pointed. Mr. Harmon testified that he joined Mr. Yarbrough because Mr. Harmon was drunk and "ready to fight."

Mr. Harmon testified that he walked up the stairs, stood in front of the victim, and blocked him from walking down the stairs. Defendant and Mr. Yarbrough followed Mr. Harmon up the stairs. At some point, Mr. Harmon and the victim had words because Mr. Harmon was blocking the victim. Mr. Harmon testified that a "security guard come up and was like, 'what's going on.' [The victim] told him everything was alright, so as soon as he walked off, [the victim] hit [Mr. Harmon] and [he] fell to the ground." Mr. Harmon heard gunshots when he got up. He said that he saw Defendant "reach back his hand" but he did not actually see a gun. He also saw flashes near Defendant. Mr. Harmon testified that he never saw the victim strike Defendant or Mr. Yarbrough, and he did not see more than one gun at the club that night. Mr. Harmon testified that he did not see Defendant's glasses get knocked off, and he never saw Defendant without his glasses while at the club. Mr. Harmon testified that Defendant and Mr. Yarbrough ran out of the club after the shooting. Mr. Harmon found Ms. Scott and Ms. Raspberry, and they left.

Nakenda Diggs testified that she was at Fahrenheit 101 on August 25, 2012, with Keenan Kendall and someone named "Mitch." She was there to watch her friend, Zack Teague perform. Ms. Diggs testified that Mr. Kendall and "Mitch" had also given Ms. Ray a ride to the club. Ms. Diggs did not know the victim or anyone else involved in the altercation and shooting. However, she had known Tomika Ray for more than ten years. She said that Ms. Ray spoke to her before the shooting, and Ms. Diggs noticed that a man in a yellow shirt, whom she identified as "Bennie" or Jiles Yarbrough, had been paying a lot of attention to Ms. Ray. Ms. Ray told Ms. Diggs that the victim had pulled her hair. At some point before the shooting, Ms. Diggs saw three people approach the victim upstairs, and they "surrounded him like a crescent moon." Ms. Diggs testified that the men began to argue, and the victim appeared to lean in to listen to what the men were saying to him. She said that Mr. Yarbrough was arguing more with the victim than the others. At some point, Ms. Diggs saw the victim strike Mr. Yarbrough and she thought that he hit another person but she did not know the person's name. After the fighting began, Ms. Diggs heard "a big, loud pop noise, and [she] thought it was a beer bottle being hit across somebody's head[.]" She then saw the victim "holding himself going down towards the steps, and then next more shots, and by this time [Ms. Diggs] got

5

knocked down." Ms. Diggs testified that she heard one shot, a pause, and then three additional shots. She said that after the victim headed down the stairs, the shooter, whom she identified as Defendant, leaned over to fire more shots. She also said that Defendant moved toward the stairs. Ms. Diggs testified that two of the men ran out of the club after the shooting.

On cross-examination, Ms. Diggs testified that the victim knocked Mr. Yarbrough to the ground first, followed by Mr. Harmon. She also agreed that Defendant got "busted in the face." Ms. Diggs testified that Mr. Taylor, the bouncer, came over, and Defendant reached over Mr. Taylor and was shooting toward the victim.

Crystal Tessier testified that she went to Fahrenheit 101 on August 24-25, 2012, with Brittany Murray and Zack Teague to see Mr. Teague's concert. She knew the victim but not anyone else involved in the altercation or shooting. Mr. Tessier testified that before the shooting, she was near the bar taking a picture with Mr. Teague and "Kenny" when someone yelled "[t]here's a fight." She looked over and saw the victim surrounded by three men. She then saw "the short one with the striped shirt fall." Ms. Tessier did not see anyone else fall to the floor, and she did not see anyone else get hit or shoved. After the man fell to the floor, Ms. Tessier saw Defendant fire the first shot. There was a pause, and she heard three additional gunshots. She saw the victim "duck down, and he was down the steps." Ms. Tessier later identified Defendant from a photographic lineup.

Brittany Murray testified that Zack Teague is her fiancé and the victim's cousin. Although the victim lived in Nashville, he was at Fahrenheit 101 on August 24-25, 2012, to watch Mr. Teague perform a concert. Ms. Murray testified that she and Ms. Tessier were also at the club at that time to watch the concert. Prior to the fight and shooting, Ms. Murray was behind the bar area taking a picture of Mr. Teague, Ms. Tessier, and another cousin named "Kenny." Ms. Murray noticed a "group of guys" surround the victim, and a fight broke out. She testified:

> I seen the fight. I seen [the victim]. A guy fell down the stairs that was in the front, and they all just started fighting, and then all of a sudden a shot rang out, and then not too much longer after that, a split second, it was three, three shots.

She did not see anyone else fall to the floor. Ms. Tessier testified that after the first shot, the victim went down the stairs to get away from the men. Defendant then "raised up over the people that were in front of him and popped it three times." The victim "landed in the middle of the dance floor." After the shooting, Defendant ran down the steps and

6

out the door.  Ms. Murray later identified Defendant as the shooter from a photographic lineup and the video from the nightclub.

Keenen Kendall testified that he has had three prior felony drug convictions within the past ten years, and he was on parole at the time of trial.  Mr. Kendall testified that he immediately left the club after the shooting because he was on parole and was not supposed to be there.  He acknowledged that he did not appear in any of the videos from the club from August 24-25, 2012, and he later went to police of his own accord to give a statement.  Mr. Kendall testified that he went to Fahrenheit 101 on August 24-25, 2012, with Tomika Ray and Mitch Boutwell.  He left the club at some point to pick up Nakenda Diggs and drive her back to the club.   Mr. Kendall testified that the victim and Zack Teague are his cousins, and Mr. Kendall was at the club to see Mr. Teague perform.

Mr. Kendall testified that while at the club, Ms. Ray asked him for a cigarette, and then she walked downstairs and spoke to Jiles Yarbrough, who was wearing a yellow shirt.  After Ms. Ray spoke to Mr. Yarbrough, he walked up the steps with two or three other men and approached the victim.  Mr. Kendall testified that they formed a half circle around the victim.  He said that the victim and Yarbrough had words, and the victim had his hands out and appeared confused.  At some point, the bouncer walked over and then walked away.  Mr. Kendall noticed that the group of men got closer to the victim, and the victim hit Mr. Yarbrough and Mr. Harmon.  Mr. Harmon fell to the floor and then got back up.  Mr. Kendall did not notice any injuries to Mr. Yarbrough.  Mr. Kendall thought that the victim took three swings at the men as they got closer to him. He also thought that the third swing was at Defendant but he did not know if the victim actually hit Defendant.  He did not see any injuries to Defendant.  By that time, the bouncer was in the middle of the altercation.

Mr. Kendall testified that he saw Defendant "step back, raise his shirt, and pull the pistol out, and fire."  He said, "I seen him shoot once.  It got quiet and then I heard three more shots."  After the first shot, the victim went down the steps.  Mr. Kendall testified that Defendant ran to the edge of the bar, leaned over the rail and fired the three additional shots down at the victim.  Mr. Kendall later identified Defendant on the video from the night club.  On cross-examination, Mr. Kendall testified that he saw the victim touch Ms. Ray's hair.  He also testified that the victim pushed Mr. Yarbrough when the argument first began, and he hit Mr. Harmon, knocking him down.  Mr. Kendall testified that the victim swung at Defendant over the bouncer who came over but Mr. Kendall did not know if the victim struck Defendant. It was at that point that Defendant pulled out the pistol.

Dr. David Zimmerman, an assistant medical examiner, performed an autopsy on the victim.  He determined that the cause of the victim's death was multiple gunshot

7

wounds, and the manner of death was homicide.  The victim had a gunshot wound to his left shoulder that penetrated his left lung, heart, diaphragm, liver, and skeletal muscle. There was a second gunshot wound to the victim's back which penetrated his skeletal muscle, right lung, and fractured one of his right ribs.  A third bullet tore through the victim's pant leg and struck his cell phone.  Dr. Zimmerman testified that the victim also had alcohol and THC, the main chemical in marijuana, in his system at the time of death.

Steve Scott, a Special Agent Forensic Scientist for the TBI Crime Lab, testified that he received four fired bullets from the scene of the shooting, four fired cartridge cases from the scene, and the victim's pants, t-shirt, and button-down shirt. Special Agent Scott determined that all four of the cartridge cases were nine millimeter cases, and they had all been "fired in one firearm and one fire-arm [sic] only."  Concerning the bullets, Special Agent Scott testified that all four of the bullets were nine millimeter, and three of the bullets were Federal brand, and one of them was Winchester brand.  He further testified:

> Because of how that really thin copper jacket peels away on those three Federal bullets, I was not able to match those three bullets to the Winchester bullets or any of those three bullets together.
>
> I can explain that this way.  When that bullet goes down the inside of the barrel of the firearm, there is only a certain part of the bullet that comes in contact with the firearm, and that part of the bullet bares the signature, or the mechanical fingerprint of that particular firearm.  That's the part that I would look for, to be able to match.
>
> But if - - if this curved part of my hand is that bullet traveling down the barrel and that outer copper coating peels away, that coating has the marks from the firearm on it, rather than the lead that underlines it.
>
> So, with those markings absent or the copper rolled up on itself, in such a fashion, then it's very difficult, and often impossible, to match those particular kinds of bullets to one another, or to somebody, or to a firearm.

Special Agent Scott testified that he also tested the victim's clothing.  Based on gun powder and lead residue on the button-down shirt, it was his opinion that the gunshots were fired from forty-eight to sixty inches.

*Defense Proof*

Jiles Yarbrough testified that he is presently incarcerated on a previous conviction for reckless endangerment, and he is charged with first degree murder in the present case. Mr. Yarbrough testified that he did not know Defendant and that he had only met Defendant at Fahrenheit 101 through Mr. Yarbrough's participation "in the group entertainments." Mr. Yarbrough testified that he performed rap music, and he and Defendant performed on stage together on August 24-25, 2012. While at the club, he and Defendant visited, laughed, and danced throughout the course of the night. He never knew that Defendant had a gun. Mr. Yarbrough testified that they "chipped in" and bought buckets of beer.

Mr. Yarbrough identified the victim on the video from the club, and he also identified Ms. Ray. At one point on the video, the victim walked up to Ms. Ray, put his hands around her waist, and whispered something into her hair. "[S]he turned around, and he walked back off." Mr. Yarbrough testified that there was no altercation between the victim and Ms. Ray, and she remained in close proximity to the victim after he touched her. Mr. Yarbrough also identified himself and Defendant on the video talking about music, Defendant's age, and where he was from. Mr. Yarbrough testified that he and Ms. Ray were friends, and he identified her on the video walk down the steps over to him and talk into his ear because the music was loud. Defendant was also there at the time. Mr. Yarbrough testified that Ms. Ray did not speak to Defendant, and he did not tell Defendant what Ms. Ray told him.

Mr. Yarbrough testified that on the video, he reached back and touched Defendant's arm to let Defendant know that he was going upstairs to get a drink. Mr. Yarbrough testified that when he got to the top of the steps, Mr. Harmon and Defendant were already in an altercation. Mr. Yarbrough testified that prior to the altercation he had told Mr. Harmon that Ms. Ray said the victim had pulled her hair. He then pointed the victim out to Mr. Harmon. Mr. Yarbrough claimed that Mr. Harmon indicated that he was "going to the bar anyway," and that Mr. Harmon went upstairs and was dancing at the top of the stairs near the victim. He also claimed that the victim bumped into Mr. Harmon. Mr. Yarbrough testified that during the altercation between the victim and Mr. Harmon, the bouncer walked up to see what was going on. Mr. Yarbrough told him that they were talking, and the bouncer walked away. Mr. Yarbrough testified that the victim and Mr. Harmon had words again, and the victim punched Mr. Harmon knocking him down, and he also punched Mr. Yarbrough and Defendant. Concerning the fight, Mr. Yarbrough testified:

When he hit me it shocked me, cause I didn't know where the punch was coming from, cause I wasn't expecting to be punched, and as you can see on the video, I got - - -

I'm like this. I've got my hands up, like this, and that time I see him striking [Defendant], and when he hit [Defendant], [Defendant] was holding a nose bleed, and pushing his glasses up at the same time.

And then when I had started back up the security guard was in the middle, so I was started back up to get in the fight, cause at a point I knew that [the victim] had hit me.

And when I had stood back up, [the victim] was coming toward me, and then that's when he broke out. I heard the shots fired. He broke out, pushing me out of the way and came down the steps.

Mr. Yarbrough testified that Defendant produced the gun after the victim hit Defendant. Mr. Yarbrough testified that as he ran out of the club, he saw Defendant holding his head down. He said that he pushed Defendant toward the door because he thought that Defendant could not see. Mr. Yarbrough testified that he left the club in a car with his two best friends, Tyler Burns and Kyah Odom. Mr. Yarbrough testified that he had never seen Defendant before or after the night of the shooting.

On cross-examination, Mr. Yarbrough agreed that he had two convictions for felony reckless endangerment and a conviction for possession of more than .5 grams of cocaine. He was on probation at the time of the offenses in this case. Mr. Yarbrough testified that he did not actually see Defendant shoot the victim although it was reflected on the video. He said that he heard four shots at the time of the shooting and that they all occurred together. He did not hear a pause after the first shot. Mr. Yarbrough clarified that he did not know Defendant before August 24-25, 2012, but he had spoken with Defendant after the shooting because they were in "lock down" together in the Henry County Jail. Mr. Yarbrough testified that he had not spoken to Defendant since that time although Defendant had written him three or four times since Mr. Yarbrough was moved to the Whiteville Correctional Facility. Mr. Yarbrough then was shown, and he identified, fourteen letters that Defendant had written to him while Mr. Yarbrough was housed in the West Tennessee State Prison and the Whiteville Correctional Facility. The letters were written between June of 2013 and November 6, 2013, and Mr. Yarbrough admitted that he had read all of them. However, he denied that any of the letters indicated that he knew Defendant prior to August 24-25, 2012.

10

Mr. Yarbrough testified that he and Ms. Ray were friends but they were not dating at the time of the shooting. He did not see the victim touch Ms. Ray's hair at the club but she told him about it. Mr. Yarbrough admitted that he said something about "whooping" the victim; however, he claimed that he laughed after making the statement. He also admitted that he pointed out the victim to Mr. Harmon and told Mr. Harmon what Mr. Ray told him. Defendant was standing behind him at the time. After Mr. Yarbrough told Mr. Harmon what happened to Ms. Ray, he turned around and said something to Defendant. Mr. Yarbrough claimed that he told Defendant, "Let's go get a drink." After that, Defendant, Mr. Yarbrough and Mr. Harmon walked up the stairs. Mr. Yarbrough denied that the video showed that Mr. Harmon was trying to block the victim at the top of the stairs. He said that Mr. Harmon was merely dancing, and the victim bumped into him and the two men began arguing. Mr. Yarbrough claimed that he, Defendant, and Mr. Harmon were on their way to the bar to get a drink. He testified that he was afraid after the victim punched him but he was ready to fight. Mr. Yarbrough admitted that he ran out of the club behind Defendant after the shooting occurred. He said that Defendant was holding his nose, and it appeared that he could not see.

*State's Rebuttal*

Agent Joe Walker was recalled as a witness and testified that when he and Investigator Jenkins travelled to Norfolk, Virginia to pick up Defendant, Defendant agreed to waive his rights and give them a statement. Defendant told Agent Walker and Investigator Jenkins that he did not kill the victim or have a gun at the club. Defendant also stated that he knew Mr. Harmon prior to his time spent in jail for previous convictions, and he met Mr. Yarbrough "after he got out of jail the last time" which would have been prior to August 24-25, 2012. Defendant never mentioned that the victim struck him or that he acted in self-defense.

Defendant was interviewed again after he arrived in Henry County. He was advised of his rights a second time. During the second interview, Defendant did not deny shooting the victim. He also did not mention anything about self-defense or any injuries that he sustained.

On cross-examination, Agent Walker testified that Defendant indicated that he was at the wrong place at the wrong time and that he was ashamed of the situation he had gotten himself into. Defendant said that he did not have anything to say and that he was going to talk to God.

11

*Analysis*

Defendant argues that the evidence was insufficient to support his conviction for premeditated first degree murder. He asserts that the evidence did not support a finding of premeditation and "that the judgment of the trial court be reversed and dismissed or alternatively appellant found guilty of manslaughter and remanded back to the trial court for re-sentencing." We disagree.

Initially, the State points out in a footnote on the "Statement of the Case" that Defendant's notice of appeal was untimely filed. The technical record indicates that the order overruling Defendant's motion for new trial states on its face that it was "ENTERED Nunc Pro Tunc for the 11th day of April, 2014, on this the 12th day of April, 2014." However, the order was not filed by the trial court clerk until May 13, 2014. Thereafter, Defendant filed a notice of appeal on June 5, 2014, "from the final Order filed of record in this action on the 13th day of May, 2014." Rule 4(a) of the Tennessee Rules of Appellate Procedure provides that a notice of appeal "shall be filed with and received by the clerk of the trial court within 30 days after the date of the entry of the judgment appealed from; however, in all criminal cases the 'notice of appeal' document is not jurisdictional and the filing of such document may be waived in the interest of justice." We find that the order denying Defendant's motion for new trial was entered on May 13, 2014, the day that it was filed with the trial court clerk. *See State v. Stephens*, 264 S.W.3d 719, 730 (Tenn. Crim. App. 2007)("[T]he order of sentence was entered on the date the uniform judgment document was filed with the court clerk[.]"); *Graham v. State*, 90 S.W.3d 687, 689 (2002)(Petitioner's appeal was timely filed because it "was filed within ten days of the date the trial court's order denying the motion to reopen was filed with the clerk " rather than when it was signed by the trial court.); *State v. Willie Norman*, No. W2003-02067-CCA-R3-CD, 2004 WL 2255253, at *5 (Tenn. Crim. App. Oct. 7, 2004)(Defendant's notice of appeal was timely filed because it was filed within thirty days of the date in which the judgment was filed with the clerk.); *State v. Martin Boyce*, No. W2012-00887-CCA-R3-CD, 2013 WL 4027244, at *7-9 (Tenn. Crim. App. Aug. 6, 2013)("Absent a 'stamp-filed' judgment, we are unable to conclude that Defendant's motion for new trial was not timely filed."); *State v. Kenny Kimble*, No. W2012-00407-CCA-R3-CD, 2013 WL 3795949, at *3-4 (Tenn. Crim. App. July 22, 2013)("The judgement of conviction was not stamp-filed by the clerk, and thus there is nothing in the record to show that the motion for new trial was filed late."). Therefore, Defendant's notice of appeal in this case was timely filed.

When an accused challenges the sufficiency of the convicting evidence, our standard of review is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 99 S. Ct. 2781, 2789 (1979). The

trier of fact, not this Court, resolves questions concerning the credibility of witnesses and the weight and value to be given the evidence as well as all factual issues raised by the evidence. *State v. Tuttle*, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). Nor may this Court reweigh or re-evaluate the evidence. *State v. Cabbage*, 571 S.W.2d. 832, 835 (Tenn. 1978). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. *Id.* Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this Court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of [the] evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

Premeditated first degree murder is "[a] premeditated and intentional killing of another[.]" T.C.A. § 39-13-202(a)(1). Premeditation "is an act done after the exercise of reflection and judgment. 'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." T.C.A. § 39-13-202(d). The element of premeditation is a question of fact to be determined by the jury. *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000); *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997). Premeditation "may be established by proof of the circumstances surrounding the killing." *Suttles*, 30 S.W.3d at 261. The Tennessee Supreme Court noted that there are several factors which tend to support the existence of premeditation, including the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, declarations of an intent to kill by the defendant, evidence of procurement of a weapon, the making of preparations before the killing for the purpose of concealing the crime, and calmness immediately after the killing. *Id.*; *see Bland*, 958 S.W.2d at 660. Premeditation may be shown when a victim is shot from behind. *State v. Caldwell*, 671 S.W.2d 459, 463 (1984). Premeditation may also be inferred from a defendant's "attempt to shoot the victim again after he had been felled by the first shot and rendered helpless." *State v. Anderson*, 835 S.W.2d 600, 605 (Tenn. Crim. App. 1992).

In a light most favorable to the State, the proof shows that Defendant, along with Jiles Yarbrough and Cody Harmon, confronted the victim at Fahrenheit 101 for touching Tomika Ray's hair. Ms. Ray testified that she had told Mr. Yarbrough that the victim pulled her hair and that she would point out the victim by looking "up at him." Mr. Yarbrough then stated that he was going to "[w]hoop" the victim. Cody Harmon testified that Mr. Yarbrough gathered Mr. Harmon and Defendant to Mr. Yarbrough, and he said that he was going to "whoop somebody." Mr. Yarbrough then pointed toward where the victim was standing. Mr. Harmon proceeded to walk up the stairs and stand in front of the victim blocking him from walking down the stairs. Defendant and Mr. Yarbrough followed Mr. Harmon up the stairs. Mr. Harmon and the victim then had words because

13

Mr. Harmon was blocking the victim. Nakenda Diggs, Crystal Tessier, Brittany Murray, Tommy Taylor, and Keenan Kendall all testified that they saw Defendant, Mr. Harmon, and Mr. Yarbrough surround the victim, and there was an argument. The victim hit Mr. Harmon knocking him to the ground. Mr. Harmon testified that he did not see the victim strike Defendant or Mr. Yarbrough. While there was some testimony that the victim also hit Mr. Yarbrough and Defendant, no one other than Mr. Yarbrough testified that Defendant's nose was bleeding and that he saw Defendant pushing his glasses back up.

Defendant then pulled his gun out and shot the unarmed victim who immediately retreated down the stairs to get away from the men. Defendant rose up over the bouncer who had attempted to break up the fight and continued firing shots at the unarmed victim as the victim tried to get away. Ms. Diggs testified that Defendant moved toward the stairs and leaned over to continue his shooting at the victim. Mr. Taylor, the bouncer, testified that Defendant fired at the victim "all the way down the stairs." One of the shots struck the victim in the back as he was running away. The victim collapsed on the dance floor and died as a result of multiple gunshot wounds. After the shooting, Defendant ran out of the club and later fled to Norfolk, Virginia with Charles Liphford. After his arrest, Defendant never told police that the victim hit him in the face and that his nose was bleeding.

From this evidence, a rational jury could have reasonably concluded that Defendant committed the offense of first degree premeditated murder. In summary, Defendant pulled a concealed weapon out during a fight in a bar. He shot the victim, who was unarmed, three times. One bullet went through the victim's pant leg and struck his cell phone. Two additional shots struck the victim in the back causing his death. It can be inferred from the proof that these shots were fired as the victim was running away. The Defendant was blocked while he was firing at the victim by Mr. Taylor, the bouncer, who was six feet tall and weighed two-hundred and sixty pounds. Defendant acknowledges in his brief that he had to shoot "over" Mr. Taylor to continue firing at the victim. In other words, Defendant's actions in avoiding obstacles(s) in order to shoot multiple times at a victim from behind and fleeing from Defendant is evidence of premeditation. Accordingly, the judgment of the trial court is affirmed.

_____
THOMAS T. WOODALL, PRESIDING JUDGE

14